UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| ERIKA RENEE BRADY, | ) | CASE NO. 1:12CV2175 |
| | ) | |
| Plaintiff, | ) | JUDGE JOHN R. ADAMS |
| | ) | |
| v. | ) | Magistrate Judge George J. Limbert |
| | ) | |
| CAROLYN W. COLVIN[1], | ) | **REPORT AND RECOMMENDATION** |
| ACTING COMMISSIONER OF | ) | **OF MAGISTRATE JUDGE** |
| SOCIAL SECURITY, | ) | |
| | ) | |
| Defendant. | ) | |

Erika Renee Brady ("Plaintiff") seeks judicial review of the final decision of Carolyn W.

Colvin ("Defendant"), Commissioner of the Social Security Administration ("SSA"), denying her

application for Supplemental Security Income ("SSI") and Disability Insurance Benefits ("DIB").

ECF Dkt. #1.  For the following reasons, the undersigned recommends that the Court AFFIRM the

ALJ's decision and dismiss Plaintiff's case with prejudice.

I.      **PROCEDURAL AND FACTUAL HISTORY**

On March 4, 2009, Plaintiff applied for SSI and DIB alleging disability beginning on January

1, 2006, Plaintiff's nineteenth birthday. ECF Dkt. #14 ("Tr.") at 18.[2]  Plaintiff's date last insured is

June 30, 2010.  Tr. at 20.  The SSA denied Plaintiff's application initially and on reconsideration.[3]

Tr. at 97-100.  Plaintiff requested an administrative hearing, and on November 4, 2010, an ALJ

---

[1]On February 14, 2013, Carolyn W. Colvin became the acting Commissioner of Social Security, replacing Michael J. Astrue.

[2]References to the administrative record in this case refer to the ECF docket number of the cited document and the page number assigned to cited pleading by the ECF system, which can be found in the search box at the top of the page on the ECF toolbar.

[3]Plaintiff filed previous unsuccessful SSI and DIB claims in 2005, which were not appealed.  Tr. at 93-96.

conducted an administrative hearing and accepted the testimony of Plaintiff, who was represented by counsel, and Thomas Nemberger, an impartial vocational expert ("VE"). Tr. at 42-92. On April 14, 2011, the ALJ issued a Decision denying benefits. Tr. at 18-41. Plaintiff filed a request for review, which was denied by the Appeals Council on June 27, 2012. Tr. at 1-5.

On August 24, 2012, Plaintiff filed the instant suit seeking review of the Decision. ECF Dkt. #1. On February 14, 2012, Plaintiff filed a brief on the merits. ECF Dkt. #18. On March 28, 2013, Defendant filed a brief on the merits. ECF Dkt. #19. Plaintiff filed a reply brief on April 11, 2013. ECF Dkt. #20.

**II**. **SUMMARY OF RELEVANT PORTIONS OF THE ALJ'S DECISION**

The ALJ determined that Plaintiff, who was twenty-three years old on the date of the hearing, suffered from regional enteritis; endometriosis; Crohn's disease; irritable bowel disease; pyelonephritis; eating disorder, NOS; anorexia nervosa, in remission; bulimia nervosa, in remission; obsessive-compulsive disorder; depressive disorder, NOS; and borderline personality disorder, which qualified as severe impairments under 20 C.F.R. §§ 404.1520(c) and 416.920(c). Tr. at 21. The ALJ further determined that Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, 20 C.F.R. §§404.1520(d), 404-1525, 404.1526, 416.920(d), 416.925 and 416.926 ("Listings"). Tr. at 21.

The ALJ found that Plaintiff had the residual functional capacity ("RFC") to perform light work as defined in 20 C.F.R. §404.1567(b) and 416.967(b) – including the exertional abilities to lift and/or carry up to ten pounds frequently and up to twenty pounds occasionally and to sit, stand, and walk each for six hours during the course of an eight-hour day – except that she is further limited as follows: She must have access to a restroom as needed, quantified at every two hours; She may never climb ladders, ropes, or scaffolds and can only occasionally climb ramps and stairs; and she is limited to "low-stress" work, defined as precluding tasks that involve high production quotas such as piecework or assembly line work, strict time requirements, arbitration, negotiation, confrontation, directing the work of others, or being responsible for the safety of others.

The ALJ ultimately concluded that, although Plaintiff had no past relevant work, there were jobs that existed in significant numbers in the national economy that Plaintiff can perform, including that of order clerk, food and beverage, mail clerk, and sorter.  Tr. at 30.  As a consequence, the ALJ found that Plaintiff had not been under a disability as defined in the SSA and was not entitled to benefits.

### III.  STEPS TO EVALUATE ENTITLEMENT TO SOCIAL SECURITY BENEFITS

An ALJ must proceed through the required sequential steps for evaluating entitlement to benefits.  These steps are:

1. An individual who is working and engaging in substantial gainful activity will not be found to be "disabled" regardless of medical findings (20 C.F.R. §§ 404.1520(b) and 416.920(b) (1992));

2. An individual who does not have a "severe impairment" will not be found to be "disabled" (20 C.F.R. §§ 404.1520(c) and 416.920(c) (1992));

3. If an individual is not working and is suffering from a severe impairment which meets the duration requirement, see  20 C.F.R.  § 404.1509 and 416.909 (1992), and which meets or is equivalent to a listed impairment in 20 C.F.R. Pt. 404, Subpt. P, App. 1, a finding of disabled will be made without consideration of vocational factors (20 C.F.R. §§ 404.1520(d) and 416.920(d) (1992));

4. If an individual is capable of performing the kind of work he or she has done in the past, a finding of "not disabled" must be made (20 C.F.R. §§ 404.1520(e) and 416.920(e) (1992));

5. If an individual's impairment is so severe as to preclude the performance of the kind of work he or she has done in the past, other factors including age, education, past work experience and residual functional capacity must be considered to determine if other work can be performed (20 C.F.R. §§ 404.1520(f) and 416.920(f) (1992)).

*Hogg v. Sullivan*, 987 F.2d 328, 332 (6th Cir. 1992).  The claimant has the burden to go forward with the evidence in the first four steps and the Commissioner has the burden in the fifth step.  *Moon v. Sullivan*, 923 F.2d 1175, 1181 (6th Cir. 1990).

### IV.  STANDARD OF REVIEW

Under the Social Security Act, the ALJ weighs the evidence, resolves any conflicts, and makes a determination of disability.  This Court's review of such a determination is limited in scope by § 205 of the Act, which states that the "findings of the Commissioner of Social Security as to any

fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. §405(g). Therefore, this Court's scope of review is limited to determining whether substantial evidence supports the findings of the Commissioner and whether the Commissioner applied the correct legal standards. *Abbott v. Sullivan*, 905 F.2d 918, 922 (6th Cir. 1990).

The substantial-evidence standard requires the Court to affirm the Commissioner's findings if they are supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Cole v. Astrue*, 661 F.3d 931, 937, citing *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971) (citation omitted). An ALJ's failure to follow agency rules and regulations "denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified based upon the record." *Cole, supra*, citing *Blakely v. Comm'r of Soc. Sec.*, 581 F.3d 399, 407 (6th Cir.2009) (citations omitted). When substantial evidence supports the ALJ's denial of benefits, that finding must be affirmed, even if substantial evidence also exists in the record upon which the ALJ could have found plaintiff disabled. *Buxton v. Halter*, 246 F.3d 762, 772 (6th Cir.2001). Thus, the ALJ has a " 'zone of choice' within which he can act without the fear of court interference." *Id.* at 773.

## V.    ANALYSIS

Plaintiff advances two arguments in this appeal. First, Plaintiff contends that the RFC formulated by the ALJ is not supported by substantial evidence. More specifically, Plaintiff contends that, although the ALJ gave significant weight to the medical opinion of treating gastroenterologist, Duane C. Roe, M.D., who concluded that Plaintiff required "variable" restroom breaks throughout the day, the ALJ nonetheless provided restroom breaks every two hours in the RFC. Second, Plaintiff contends that the ALJ erred by not properly evaluating Plaintiff under the Listings, and by failing to consult a medical expert with regard to whether Plaintiff's impairments medically equal a Listing.

### A.    Medical history

Plaintiff was hospitalized repeatedly during her teenage years for anorexia nervosa (binge-purge type), mixed mood disturbances (anxiety and depression), and self-injurious behavior. Tr. at 308, 319, 336. After successfully treating her eating disorders, she began experiencing

-4-

gastrointestinal problems while still in high school and was ultimately diagnosed with Irritable Bowel Syndrome  ("IBS") and Crohn's disease.

In a letter dated December 7, 2005, Lori A. Mahajan, M.D., Plaintiff's treating pediatric gastroenterologist at the Cleveland Clinic, wrote that Plaintiff experiences "flares" of her Crohn's disease which might result in some unexpected missed days from school.[4] Tr. at 1261. On December 20, 2005, Plaintiff was admitted to the Cleveland Clinic for four days due an exacerbation of her Crohn's disease. Tr. at 691.  Plaintiff reported fatigue, weight loss, nausea and vomiting, as well as four and eight bloody bowel movements per day.  She further reported that she felt urgency to move her bowels almost every time that she eats food.  Plaintiff stated that, although her appetite was good, she did not eat during the day in order to avoid having to use the restroom.

In January of 2006, Dr. Mahajan noted that Plaintiff's greatest concern was her fecal urgency. Tr. at 683. Dr. Mahajan's records reflect that her height was 5' 6" and she weighed one-hundred-and-one  pounds.  Plaintiff was using a nasal gastric feeding to supplement her nutrition. In March of 2006, Plaintiff was admitted into the hospital for a bowel obstruction and Crohn's disease. Tr. at 736.

She returned to the hospital within a week seeking treatment for depression and was assigned a Global Assessment Functioning ("GAF") of twenty, indicating some danger of hurting herself or others, or occasionally failing to maintain minimal personal hygiene, or gross impairment in communication.  Tr. at 711-713. Her symptoms included depression, anhedonia, poor sleep and appetite, hopelessness and helplessness, with an extreme potential for acting out.  Tr. at 719.  The notes reflect that Plaintiff was having difficulty accepting her Crohn's disease diagnosis and she was also struggling with her eating disorders, which "overlap[ped] in her mind" with her Crohn's disease.  Tr. at  713.

Plaintiff began treatment with Remicade 10 mg. IV solution (every four weeks) in 2006.  At a Remicade infusion follow-up appointment on February 10, 2006, Plaintiff reported one bowel movement every day to every other day.  Tr. at 674.  She indicated that the bowel movement was

_____

[4]The letter is addressed to "RHD" in Kent, Ohio.  The letter appears to have been directed to a residence hall director at Kent State University.

formed part of the week, and it was loose part of the week.  However, Plaintiff further reported that she had seven to eight episodes of urgency per day that were followed by passing mucus and blood.

In April of 2006, Plaintiff underwent a sigmoidoscopy at the Cleveland Clinic to further assess her IBS and Crohn's disease. Tr. at 383. That same month, she reported a "drastic improvement in [her] health," and that her bowel movements were down to four to five times per day, which was a reduction from nine to ten. Tr. at 562. Plaintiff further reported that she had increased energy levels.  At that time, Plaintiff's prescription medication included Remicade, Imuran, Asacol, Niferex, Prevacid, Prednisone, Reglan, Prozac, Anafranil, Duocal and Canasa rectal suppositories.  Tr. at 565.  Medical records from the Cleveland Clinic in August and September of 2006 document that Plaintiff continued to experience intermittent fecal urgency, and her bowel movements varied from constipation for five days to having seven bowel movements in one day. Tr. at 550, 534.

As previously stated, Plaintiff received nasal gastric feedings in 2006 as a supplement to maintain and/or increase her weight.  In late September of 2006, she discontinued the feedings because she felt she had gained back the weight she had lost. Tr. at 534. On September 16, 2006, Plaintiff saw Elena Lantzouni, M.D., with complaints of back pain resulting from a urinary tract infection.  Dr. Lantzouni reported that Plaintiff's weight "look[ed] great" and that "[s]he is doing okay with her Crohn's [disease]."   Tr. at 896.  Dr. Lantzouni attributed Plaintiff's recurrent infections to her tendency to hold urine.  Tr. at 902-903.

In September of 2006, Dr. Mahajan requested that Plaintiff be given accommodations through the University of Akron Accommodations Department.  Dr. Mahajan stated that Plaintiff required the ability to schedule her classes around set medical appointments (likely for her intravenous infusion therapy), that she be allowed to miss class and make up assignments without penalty, and that she be allowed to use the bathroom when needed during class. Tr. at 1265.

Approximately one month later, in late October 2006, Massood R. Babai, M.D., Plaintiff's psychiatrist, who began treating her in March of that same year, completed a questionnaire regarding Plaintiff's physical and mental health.  Tr. at 915-917.  According to Dr. Babai, Plaintiff's physical and medical conditions had been poorly controlled. He reported that Plaintiff has had "periodic

disabling exacerbations of these [conditions] affecting her ability to attend [to her]self and her [activities of daily living]." Tr. at 916. He remarked that Plaintiff has not had any period of stability since being under his care. Tr. at 917.

In February of 2007, Dr. Mahajan noted a mild exacerbation of Plaintiff's Crohn's disease following a discontinuation of corticosteroids, but she commented, "[o]verall [Plaintiff] is doing well." Tr. at 521.  In July and August of 2007, Dr. Lantzouni noted that Plaintiff' was doing "quite well." Tr. at 963-965.

Plaintiff pursued a nursing degree in college.  Plaintiff attended a vocational assessment in August of 2007, where Frederick G. Leidal, Psy.D., reported that she is not suited for employment as a nurse. Tr. at 921-930.  Dr. Liedal concluded that Plaintiff was ill equipped to deal with stressors associated with the nursing profession, in addition to her own stressors. Tr. at 929. Dr. Leidal reported that even when Plaintiff is not stressed, she has two flares of her Crohn's disease per month, lasting about one week each. Tr. at 942. He acknowledged that her symptoms have interfered with work either through absences or spending most of her time in the bathroom.

In September of 2007, Plaintiff reported some continued difficulties with fecal incontinence. Tr. at 517. Plaintiff was experiencing up to seven stools per day.  However, at the time, Plaintiff was a full-time student at the University of Akron and working sixteen hours a week at a Blockbuster video rental store.  In October 2007, Plaintiff's weighed 137 pounds and was hospitalized for two days due to cellulitis.  Tr. at 1058. She was again admitted to the hospital from April 19 through April 22, 2008 due to a urinary tract infection and pyelonephritis. Tr. at 1056.

On July 2, 2008, Plaintiff reported to Dr. Lantzouni that her Crohn's was "acting up a little bit." Tr. at 1128. At her follow-up appointment on August 28, 2008, Plaintiff sought treatment for irregular menses, but did not mention her Crohn's disease. Tr. at 1133. As of October 15, 2008, when she returned for a follow-up for treatment of  iritis (an eye inflammation), her Crohn's disease was under good control. Tr. at 1183. On November 20, 2008, Plaintiff reported occasional flare-ups with abdominal pain and frequent bowel movements –  specifically she reported five to six loose stools daily during a flare. Tr. at 1153. However, she reported doing well currently with no stools for four days. Tr. at 1153. Dr. Mahajan opined that the flare ups seem to occur shortly before

-7-

Plaintiff is due for her next Humira injection.  Otherwise, Plaintiff was treated her for a urinary tract infection. Tr. at 1153.

On October 1, 2008, Dr. Babai again reported to Social Security about Plaintiff's mental health. His report was consistent with the October 2006 report, stating that despite partial control of her condition, she still has periodic exacerbations which have been adversely affecting her ability to attend to her activities of daily living.  Tr. at 1148.

In December of 2008, Plaintiff required emergency room treatment for pyelonephritis. Tr. at 1203. A few months later, from March 4 through 7, 2009, she was hospitalized at Akron City hospital for pyelonephritis, intractable flank/abdominal pain, and a flare of her Crohn's disease. Tr. at 1218. During this flare, Plaintiff reported twenty episodes of vomiting and  thirty episodes of diarrhea in one day. Tr. at 1220.  However, Patrick S. Blakeslee, D.O., the physician that discharged Plaintiff from the hospital, opined that it was very unlikely that Plaintiff's Crohn's disease was actively contributing to her presentation. Tr. at 1218. A kidney infection was diagnosed and treated Tr. at1218-1224.

On May 29, 2009, Plaintiff was referred by Dr. Lantzouni to Duane Roe, M.D., for evaluation of her Crohn's disease. Tr. at 1228,  1270. Dr. Roe requested a colonoscopic evaluation to reassess the extent of her disease.  Tr. at 1228.  On September 8, 2009, Dr. Roe found no evidence of active Crohn's disease but noted that Plaintiff had been diagnosed with endometriosis for which she was prescribed birth control pills.  Tr. at 1288.

Plaintiff discovered that she was pregnant about that same time. Plaintiff continued Humira 40 mg., which had been previously prescribed to treat her Crohn's disease. Tr. at 1285.  However, approximately six months into her pregnancy, Plaintiff discontinued Humira.  Tr. at 1284.  During the remainder of her pregnancy, she was prescribed Canasa 1000 mg.  suppositories.  Tr. at 1283. According to Dr. Roe, Plaintiff's bowels remained under good control during the course of her pregnancy with only minimal flare-ups.  Tr. at 1282.  Plaintiff had regular bowel movements with out evidence of bleeding.

Because Plaintiff intended to breast feed following the birth of her child, she did not resume her Humira injections following her son's birth in June 2010. Tr. at 1282, 1293. During the next two

-8-

months, Plaintiff's symptoms increased. Tr. at 1279.  Gallbladder disease was ruled out and Plaintiff discontinued breast feeding.  Tr. at 1276, 1291. Dr. Roe recommended further testing to determine Plaintiff's course of treatment Tr. at 1291.  At the hearing, Plaintiff testified that she had restarted weekly Humira injections. Tr. at 59.

Dr. Roe completed a "Crohn's & Colitis Residual Functional Capacity Questionnaire" on October 27, 2010.  Tr. at 1270-1274.  Plaintiff's treatment in October of 2010 included Humira, Lialda, and Canasa suppositories.  Dr. Roe notes that Plaintiff experiences "intermittent" symptoms of mild and "crampy" lower abdominal pain, chronic diarrhea, nausea, and rectal bleeding. Dr. Roe documented her symptoms as chronic diarrhea, abdominal pain and cramping, nausea, and rectal bleed. Tr. at 1270. He noted that her pain or other symptoms will often be severe enough to interfere with attention and concentration. Tr. at 1271.

The ninth question on the form asks, "Will your patient sometimes need to take unscheduled restroom breaks during an eight-hor working day?"  The question continues, "If yes, (1) How often do you think this will happen?  (2) How long will your patient be away from the work station for an average unscheduled restroom break? (3) How much advanced notice does your patient need for a restroom break?"  Dr. Roe did not provide any specific answers to the foregoing questions. However, next to the questions, Dr. Roe wrote, "variable" Tr. at 1273.

**B.      State agency physical assessments**

In connection with Plaintiff's first application for benefits, on May 25, 2006, Elizabeth Das, M.D., a state agency physician, reviewed the medical evidence of record and completed a residual functional capacity assessment.  Dr. Das opined that Plaintiff could perform light exertional work that never requires climbing ropes, ladders, or scaffolds and occasionally requires climbing ramps and stairs. Tr. at 886-893.  Leslie Green, M.D., affirmed Dr. Das's opinion on December 15, 2006. Tr. at 919.  In connection with Plaintiff's current application for benefits, on May 5, 2008, Malika Haque, M.D., reviewed the medical evidence of record and completed a residual functional capacity assessment.  Dr. Haque opined that Plaintiff could perform heavy exertional work. Tr. at 1119-1124. Ronald Cantor, M.D., affirmed this opinion on December 3, 2008. Tr. at 1161.

### C.    Hearing testimony

At the hearing, Plaintiff testified that she is 5' 7" tall and weighed 114 pounds. Tr. at 52. Although she could not specifically identify the date of her wedding, she was married in either December of 2009 or January of 2010.  She has a son who was four-months old on the hearing date. She was in her sixth year of the nursing program at the University of Akron.  Tr. at 52.  At the time she was taking thirteen credit hours of classes in addition to performing her clinicals approximately twenty-four hours per week at a local hospital.  She also had a part time job at Suma Tech, working as a nurse technician, which she began in August of 2009.  Tr. at 54.  Her hours at Suma varied, as she testified that she had only worked eight hours there in the past six weeks.

Plaintiff testified that she suffered from anorexia from the age of twelve to the age of sixteen or seventeen. Tr. at 58.  She further testified that she was hospitalized because of the disease for a year. Presumably, her hospitalization successfully treated her illness, because during her junior year of high school, Plaintiff was "doing well" and she was a member of the basketball team.  Then, a year later, she was diagnosed with Crohn's disease.  Beginning in the summer of 2004, Plaintiff worked in a bagel shop, first as a counter person and then as a shift manager.  Tr. at 159.  Plaintiff graduated from high school in 2005.   Tr. at 164.

Plaintiff explained that she had problems with the medication prescribed to treat her Crohn's disease because it was difficult to find an effective medication, and then, as is common with Crohn's patients, she built a tolerance to the medication and it was no longer effective in treating her illness. As a consequence, she suffers flare-ups.  However, she conceded at the hearing that her medical records show that some of her flare-ups were attributable to her failure to comply with her medication regimen. Tr. at 59.  She explained that steroids made her anxious and, as a consequence, she did not take them as prescribed.

Plaintiff worked as a shift manager at Blockbuster, a video rental store, until 2008.  Tr. at 56.  She averaged twenty to twenty-five hours a week at Blockbuster, while going to school and making the Dean's List.  Tr. at 56, 74. She testified that she lost a lot of weight while working at Blockbuster, and that her manager provided accommodations due to her illness.

-10-

The ALJ explained to Plaintiff at the hearing that she found it difficult to resolve Plaintiff's active lifestyle with the alleged limitations created by her Crohn's disease.  For instance, the ALJ asked the Plaintiff to explain why she would pursue a nursing degree, when, according to Plaintiff, as well as a vocational assessment conducted in August of 2007, she is not suited for employment as a nurse.  Plaintiff responded that she wanted a profession that allowed her to help people, and that she became interested in medicine as a result of her medical problems in her teenage years.  Plaintiff further stated that, although she could not be a full-time floor nurse in a hospital, she could work part-time, or as a teacher or in a doctor's office.  Plaintiff contended that she could not work three twelve-hour shifts (full-time) because it would "send her back to the hospital."  Tr. at 61-62.  She explained that, during her clinicals, she had "someone over [her], and [she's] able to run to the bathroom if [she's] in a patient's room."  Tr. at 62.

Plaintiff testified that when her Crohn's disease flares, she defecates up to fifteen times a day, otherwise she typically defecates twice a day.  Tr. at 62-63.  A flare-up can last one to six months.  Tr. at 65.  Her pain on a typical day is three or four out of ten, however, during a flare-up her pain is six or seven out of ten.  Tr. at 66.  Plaintiff testified that her colon will occasionally prolapse. Tr. at 63. She was recently diagnosed with endometriosis, which adds to her abdominal pain.  Tr. at 67-68.

Plaintiff had been diagnosed with depression, which was successfully treated with Prozac. She testified that she discontinued Prozac when she was pregnant, but was likely to resume taking the medication because she had been a "basket case" lately.  Tr. at 70.  She further testified that she struggles to find a balance between her previous problems with anorexia and her Crohn's disease, that is, her reluctance to eat due to her Crohn's disease is often misinterpreted by her family as a relapse of her anorexia. Tr. at 68-69.  When she was asked at the hearing about discontinuing her use of "Boost", a high-calorie dietary supplement, she explained that it had a milky consistency that she believed was causing stomach upset and agitation of her Crohn's disease.  Tr. at 72.

On a typical day, Plaintiff rises at 4:30 a.m.  She prepares herself and her son for the day. She does not eat due to her concern that she will need to use the restroom during class or at the hospital.  She returns home at 5:00 p.m.  She performs household chores, although her husband

-11-

contributes to the housekeeping duties.  Tr. at 71.  Plaintiff testified that she is "worn out" on her day off.  Tr. at 72. However, she conceded at the hearing that, during her three-and-a-half years of nursing school she had only missed two days of clinicals and was sent home on two days due to illness.  Tr. at 76.

The VE testified at the hearing that excessive bathroom breaks would "impact the data base significantly" when testifying about the impact of frequent bathroom breaks and the availability of jobs in the national economy.  Tr. at 81. He testified that one bathroom break every two hours was acceptable, and that one break every hour also would not impact the job base so long as the break was five minutes or less.  Tr. at 82.  However, the VE conceded that competitive employment would be eliminated "eventually" if an individual that was off task at a job fifteen percent of a day . Tr. at 90.  Additionally, the VE testified that if an individual was absent from work two or more days per month, that also would eliminate competitive employment.  Tr. at 87.

### D.    The ALJ's decision

The ALJ gave little weight to the opinions of the state agency medical consultants who found that Plaintiff was limited to a full range of medium work.  In fact, the ALJ credited the opinion of the state agency consultants who reviewed her file for her previous application in 2005 and found that she was limited to light work with additional postural limitations.  The ALJ also credited opinion of Dr. Roe, writing that "significant weight was given to Dr. Roe's opinion because it is consistent with his treatment notes and longitudinal medical evidence but also because it properly notes the variability of her required restroom break with her flare-ups of Crohn's disease."  Tr. at 27.

### E.    Plaintiff's RFC

Plaintiff contends that the RFC, more specifically, the ALJ's assessment of the frequency with which Plaintiff requires bathroom breaks, is not supported by substantial evidence. Plaintiff contends that the RFC is at odds with the ALJ's assertion that she gave significant weight to Dr. Roe's opinion.  The RFC allows for bathroom breaks every two hours, whereas Dr. Roe indicated that Plaintiff would require "variable" bathroom breaks.

First, it is important to note that Dr. Roe did not answer any of the questions regarding bathroom breaks with specificity.  He provided no explanation regarding the frequency or length of the bathroom breaks Plaintiff would require during a flare-up or when Plaintiff's Crohn's disease is well controlled. Therefore, Plaintiff's alleged need for more frequent bathroom use is based entirely on her own subjective complaints, which the ALJ found not credible. Tr. 25, 30. A claimant's own description of her impairments and symptoms, standing alone, is never sufficient to establish an impairment. 20 C.F.R. §§ 404.1528(a), 416.928(a).  The ALJ ultimately found that the medical evidence does not establish that Plaintiff would need unlimited bathroom breaks more than every two hours for ten minutes at a time, would miss three days of work each month, or would be off task fifteen percent or more of the time. Tr. at 29. Additionally, the ALJ noted that Plaintiff's continued work activity while attending school and starting a family showed that she did not require bathroom breaks as frequently as she alleged. Tr. at 29.

Moreover, Dr. Roe's statement that Plaintiff requires "variable" bathroom breaks could refer to the fact that her need for bathroom breaks will vary depending upon whether she is experiencing a flare-up.  The record establishes that Plaintiff's Crohn's disease occasionally flares, but does not support the conclusion that Plaintiff's bathroom use precludes all full-time employment.  A review of the record demonstrates that Plaintiff has experienced sustained periods of relief from her Crohn's symptoms since her alleged onset date, as well as periods when she was only mildly symptomatic.

For instance, Plaintiff reported "drastic improvement" with four to five bowel movements per day in April of 2006. Tr. at 854. Dr. Lantzouni noted steady improvement of Plaintiff's Crohn's disease and that her weight looked great as of September of 2006. Tr. at 896, 898, 900, 902.

In February of 2007, Dr. Mahajan noted a mild exacerbation following a discontinuation of steroids.  Tr. at 521.  In July and August of 2007, Dr. Lantzouni noted that Plaintiff's Crohn's disease continued to do "quite well." Tr. 963, 965.

On July 2, 2008, Plaintiff reported that her Crohn's was "acting up a little bit." Tr. at 1128. Plaintiff did not mention her Crohn's disease when she returned a month later, and as of October 15, 2008, Plaintiff's Crohn's disease was under good control. Tr. 1133, 1183. On November 20, 2008, Plaintiff reported occasional flare-ups with abdominal pain and frequent bowel movements –

specifically she reported five to six loose stools daily during a flare; however, she reported doing well currently with no stools for four days. Tr. at 1153.

On April 27, 2009, she reported an exacerbation of Crohn's disease but it was "not that bad." Tr. at 1172. As of September 8, 2009, Dr. Roe found no evidence of active Crohn's disease, and Plaintiff's Crohn's disease remained under good control through her son's birth in June 2010. Tr. at 1231, 1253, 1255, 1282, 1288, 1293, 1295. When Plaintiff stopped taking her medications to breastfeed her son, her symptoms increased, but at the time of the hearing she had restarted her medication. Tr. at 59, 1279, 1282, 1293.

Of equal import, Plaintiff continued to work, although not at a substantial gainful level, since her alleged onset date.  From January of 2006 to March of 2009 she worked long hours at the bagel shop and at Blockbuster.  Tr. at 29, 159, 167, 227, 249, 184-86, 865, 869, 942. Thereafter, she began working as a nurse technician and posted substantial earnings from this job. Tr. at 29. While working part-time, Plaintiff attended college and nursing school, which involves both class attendance and the completion of clinical hours. Tr. at 52-53.

Although given accommodations for her medical conditions, in three years Plaintiff only missed four days and is on the Dean's List. Tr. at 57, 76. Plaintiff admits that her current work and school schedule amounts to as much as thirty hours a week. In addition, Plaintiff must study, maintain her home, and care for her four-month old son. Tr. at 49, 51-52, 70-71, 1235-52.  In sum, Plaintiff maintains a demanding schedule that does not support her allegation that she is unable to work on a full-time basis. Tr. at 29-30.

Plaintiff's arguments in this appeal appear to be predicated upon the mistaken idea that the ALJ concluded that Plaintiff can perform full-time employment as a nurse in a hospital.  The ALJ obviously credited Plaintiff's testimony that she could not maintain full-time employment in a hospital setting.  The ALJ acknowledged that the medical record reflects that flare-ups of Plaintiff's Crohn's disease and her anxiety are triggered by stress.  As a consequence, the ALJ limited Plaintiff to sedentary "low stress" work.  In other words, the ALJ relied upon her ability to maintain her current hectic schedule to conclude that she is capable of sedentary low-stress work on a full-time basis.

-14-

Because Dr. Roe concluded rather vaguely that Plaintiff would require variable bathroom breaks during the workday, and the medical record and Plaintiff's demanding schedule are at odds with her claim that she is unable to perform full-time work,  the undersigned recommends that the Court find that the RFC was supported by substantial evidence.

### F.        The Listings

Although Plaintiff concedes that her impairments do not meet Listing 5.06, Part B, she argues that her impairments in combination equal the requirements of that Listing (as well as 5.08 (digestive disorders), 12.04 (depression), 12.06(obsessive compulsive disorder), and 12.00(D)(12)(anorexia)).  Tr. at 1315.  Plaintiff further contends that the ALJ erred by failing to acquire a medical expert's opinion on the issue of medical equivalence.  To the contrary, the ALJ correctly determined that Plaintiff's combination of impairments do not equal Listing 5.06, Part B and no medical expert testimony on the issue of equivalence was required.

At the hearing, Plaintiff's counsel asserted that Plaintiff's impairments medically equaled Listing 506, Part B.  Plaintiff's counsel argued:

> I will tell you this, my brief basically says that we have several components of [Listing 506, Part B].  I think that more appropriately, it might be an equals with her anxiety disorder, her history of the anorexia, and the other limitations.  But I do go through in what I believe to be quite some detail about the [serum] levels required from Crohn's, the evaluation regarding the anemia with her, I think it's her hemoglobin levels that are reported for the anemia, and the weight loss of 10 percent or more, the tenderness that was found, those kinds of things.

Tr. at 48.  After Plaintiff's counsel presented his argument, the ALJ responded:

> I will tell you, looking at it, I do not see where [Plaintiff] meets a listing, and, as you know, to find equivalency, I have to have an opinion of a Medical Expert. I may send this for interrogatories to ask about that because each impairment on its own does not satisfy the applicable section, but there's no doubt – there's no doubt that obviously [Plaintiff] has very significant impairments.

Tr .at 51.

Plaintiff contends that the ALJ erred in failing to obtain the opinion of a medical advisor to consider the medical equivalency of his combined impairments.  Section 416.926(b) provides, in pertinent part:

> Medical equivalence must be based on medical findings. We will always base our decision about whether your impairment(s) is medically equal to a listed impairment on medical evidence only. Any medical findings in the evidence must be supported

by medically acceptable clinical and laboratory diagnostic techniques. We will also consider the medical opinion given by one or more physicians designated by the Secretary in deciding medical equivalence.

Social Security Ruling 83-19 provides, in pertinent part:

[t]he ALJ is responsible for deciding the ultimate legal question of whether the listing is met or equalled. As trier of the facts, the ALJ is not bound by the medical judgment of a 'designated' physician regarding medical equivalency. However, the judgment of a 'designated' physician on this issue on the same evidence before the ALJ must be received into the record as expert opinion evidence and given appropriate weight. Furthermore, to assure that proper consideration is given to a medical equivalency opinion from a physician designated by the Secretary, the ALJ must obtain an updated medical judgment from a medical advisor (interrogatories may be used) in the following circumstances:

> 1. When no additional medical evidence is received, but, in the opinion of the ALJ, the symptoms, signs, and laboratory findings reported in the record suggest that a judgment of equivalency may be reasonable.

> 2. When additional medical evidence is received which, in the opinion of the ALJ, may change the determination of the SSA-831 U5/SSA-833-U5 that the impairment(s) does not equal the listing.

Plaintiff asserts that the ALJ did not adequately consider whether her inflammatory bowel disease, combined with her weight loss and mental impairments, equal Listing 5.06, Part B. On the contrary, the ALJ specifically found that Plaintiff's impairments did not meet or medically equal any listed impairment. Tr. at 21. The ALJ reviewed each of the requirements of Listing 5.06, Part B and explained that the medical evidence was insufficient to meet those requirements. Tr. at 21-22. With respect to Listing 5.08, which addresses weight loss due to a digestive disorder, the ALJ noted that Plaintiff's weight loss is complicated by her history of anorexia and bulimia, and that despite fluctuations in Plaintiff's weight, she had stabilized in the range of 124-129 pounds. Tr. at 22. The ALJ also undertook a detailed analysis of Plaintiff's mental impairments and the criteria of Listings 12.04, 12.06, 12.08.

Moreover, the ALJ explained that her finding was supported by the opinions of the state agency reviewing physicians. Tr. at 21. See *Reynolds v. Sec'y of Health & Human Servs.*, 707 F.2d 927, 930 (6th Cir.1983)(holding that ALJ can rely on state agency reviewing physicians). The completion of the Disability Determination and Transmittal Form (SSA 831) "ensures that consideration by a physician . . . designated by the Commissioner has been given to the question of

-16-

medical equivalence at the initial and reconsideration levels of administrative review." See SSR 96–6p at *3. The ALJ may rely upon such expert opinion to determine whether a claimant meets a listing requirement. *Id.*; *Curry v. Sec'y of Health & Human Servs.*, 1988 WL 89340 at *5 (6th Cir. Aug.29, 1988) ( citing *Fox v. Heckler*, 776 F.2d 738, 742 (7th Cir.1985). The governing regulations recognize these consultants as "highly qualified" and "experts in Social Security disability evaluation." 20 C.F.R. § 416.927(e)(2)(i). Thus, their medical opinions are sufficient to carry the ALJ's ruling.

Finally, the regulations do not require testimony from a medical expert to determine medical equivalence, contrary to Plaintiff's contention.  Rather, the regulations specify that the ALJ is responsible for determining medical equivalence. 20 C.F.R. §§404.1526(e), 416.926(e). Though there are instances where an ALJ must obtain medical expert opinion evidence, Plaintiff has not shown that her case warranted any further action.  Additional expert testimony is necessary when (1) "in the opinion of the administrative law judge . . . the case record suggest[s] that a judgment of equivalence may be reasonable"; or (2) "additional medical evidence is received that in the opinion of the administrative law judge ... may change the State agency medical or psychological consultant's finding". SSR 96–6p, 1996 WL 374180, at *4.  Here, no additional evidence was received, and the ALJ did not believe a judgment of equivalence was reasonable; therefore, no medical expert was required to testify.

The ALJ considered Plaintiff's digestive and mental impairments but concluded that her impairments do not meet or equal the Listings.  Furthermore, contrary to Plaintiff's argument, the ALJ was not required to seek the opinion of a medical expert.  Accordingly, the undersigned recommends that the Court find that the ALJ did not err in determining that Plaintiff's impairments did not meet or equal the Listings.

## VI.    CONCLUSION

For the foregoing reasons, the undersigned recommends that the Court AFFIRM the ALJ's decision and DISMISS Plaintiff's complaint with prejudice.


DATE: May 7, 2013

                                        ____/s/George J. Limbert_____
                                        GEORGE J. LIMBERT
                                        UNITED STATES MAGISTRATE JUDGE

ANY OBJECTIONS to this Report and Recommendation must be filed with the Clerk of Court within fourteen (14) days of service of this notice.  Fed. R. Civ. P. 72; L.R. 72.3.  Failure to file objections within the specified time WAIVES the right to appeal the Magistrate Judge's recommendation.  *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).